1.      I am a Special Agent (SA) with U.S. Homeland Security Investigations (HSI), with twenty-eight (28) years of experience as a federal agent, duly appointed according to law and acting as such. I am assigned to the Grand Rapids field office. As part of my duties, I conduct criminal investigations relating to violations of the laws of the United States. I have successfully completed the U.S. Border Patrol/FLETC Academy in Charleston, South Carolina. I possess a bachelor's degree in criminal justice from John Jay College of Criminal Justice with a minor in Police Operations and Management and a Juris Doctor from the University of Akron School of Law with a specialization in Criminal Law.  As a Special Agent, I have received training and experience relating to Federal Criminal Procedures, Federal Statutes, and HSI Regulations.  I have received training and instruction in conducting investigations into complex criminal conspiracies.

2.      This continuation is made in support of an application for a warrant to search the contents of four (4) cellular telephones (the **Subject Cellphones**).  The items are more particularly described in Attachment A of this continuation.

3.      The purpose of this application is to seize evidence, contraband, fruits, and other items related to violations of Title 18 U.S.C. § 2314: Transportation of Stolen Property; and 18 U.S.C. § 371: Conspiracy.

4.      Because this continuation is being submitted for the limited purpose of establishing probable cause, I have not included every detail of every aspect of the investigation.  Rather, I have set forth only those facts necessary to establish probable cause to search the item listed in Attachment A.  Unless specifically indicated, all conversations and statements described in this continuation are related in substance and in part.

5.      As a result of the instant investigation described more fully below, there is probable cause to believe that evidence, contraband, and fruits of, and other items related to the conspiracy to transport stolen property, in violation of Title 18 U.S.C. §§ 2314 and 371, are present on the item described in Attachment A.

## SUMMARY OF INVESTIGATION

6.      On December 5, 2024, the Kent County Sheriff's Office ("KCSO") responded to a home invasion in Cascade Township, Michigan.  The suspects ransacked the home and left with approximately $266,000 worth of valuables.  Law enforcement eventually learned that a South American Theft Group (SATG) was involved in this home invasion, as well as home invasions across the United States.

7.      The investigation was able to show that the SATG consisted of multiple Colombian nationals, who were illegally present in the United States.  The KCSO subsequently contacted HSI Grand Rapids for additional assistance based on the international and interstate nexus of the investigation.  The case was adopted for a federal prosecution in the Western District of Michigan.

8.      Additional investigation showed that the SATG would follow a very specific pattern of criminal activity in regard to the residential burglaries committed across the United States.  The following common characteristics were seen in the residential burglaries ultimately attributed to this group:

a.      The group appeared to focus on Asian and Middle Eastern business owners.

b.      The group conducted internet searches for addresses related to small businesses, followed by searches for the business owner's home address.

c.    The group then searched for social media pages associated with potential victims and their family members.

d.    The group regularly conducted searches for the closest police departments to potential victims in order to gauge law enforcement response times.

e.    The group would often use GPS trackers, which were covertly placed under victim's vehicles.  This would help ensure the victims did not unexpectedly return home and interrupt the group during a burglary.

f.    The group would typically conduct extended periods of surveillance on potential victims in order to gauge their life patterns and daily schedules.

g.    In chat communications with each other, the group discussed have the "eye" on the victims.  The context of the communications makes clear that they were using surveillance cameras to monitor the movements of victims prior to committing the burglaries.

h.    The group would share prospective victim and address information, either through text messages or chats, which provide details regarding burglaries.  The messages are normally sent to multiple group members, who are participating in the burglaries in some capacity.

i.    Group members often store each other's contact information, which includes active cellular telephone numbers.  The numbers are usually stored under group member's nicknames, which would enable investigators to further identify each group member.

9.    KCSO received information from Google, Inc. regarding the account associated with one of the main suspects in this case, John Sebastian QUINTERO-Herrera.

KCSO was able to identify an online account associated with John Sebastian QUINTERO-Herrera with the username and email address of "*Sebastianquintero1196@hotmail.com*."  An analysis of the account showed that QUINTERO-Herrera, and other coconspirators, were looking at addresses related to small business, followed by searches for the owner's home address. They would do days of research with their cellular telephones, including going to the target addresses days ahead of time and completed a search for "police" in Google maps to find the closest police department to their target. The activity was consistent with counter surveillance techniques observed with these groups, who also visit the homeowner's businesses and map out the time and distance to the victim's homes and run their license plates. They utilized online resources like "Bizapedia- Find Companies, People, Addresses, & Trademarks", "www.beenverified.com", "www.bumper.com", "Epicvin.com" all of which were observed in multiple of the conspirator's account search activities.  Other investigations, and intelligence bulletins, have indicated that this pre-planning is often done by members of South American Theft Groups (SATGs).

10.      In January of 2025, Kent County Sheriff's Office Detective Timothy Dykgraaf submitted a state search warrant to Google, Inc. The returned information consisted of a large amount of evidentiary data, which included the following:

   a. Heavy use of cell phones in order to communicate with other co-conspirators regarding potential targets, victims, and conversations regarding illicitly obtained proceeds.

   b. SATG members would use cell phones to conduct internet research on potential victims, their businesses, their families, and their social media accounts.

   c. High usage of cell phones to conduct covert surveillance on victims, who were the

intended targets of the residential burglaries. The cell phones were used to track the locations of victims whose houses were being targeted for burglaries.

    d. Usage of cell phones among co-conspirators with directions to specific businesses, which bought stolen jewelry from SATG members.

11.      On May 20, 2025, multiple members of the SATG were indicted in the U.S. District Court for the Western District of Michigan (Case No. 1:25-CR-76). Four SATG members were charged with violations of Title 18 U.S.C. § 2314 – Interstate Transportation of Stolen Property and § 2- Aiding & Abetting. Four defendants were ultimately arrested and transported to the Western District of Michigan. Three (3) subsequently pled guilty and are awaiting sentencing.

12.      The investigation into the SATG continued to focus on additional co-conspirators. Further coordination with multiple other law enforcement agencies revealed that the SATG was determined to be responsible for nearly twenty residential burglaries throughout Michigan, Ohio, Kentucky, North Carolina, Massachusetts, Wisconsin, Alabama, South Carolina, and elsewhere.

13.      On July 29, 2025, a Superseding Indictment, filed in the U.S. District Court for the Western District of Michigan (Case No. 1:25-CR-76), charged Iesua RAMIREZ-Perez, Ivan CHAPARRO-Perez, and another individual, with Conspiracy to Transport Stolen Goods in violation of Title 18, Unites States Code (USC), §§ 2314 and 371 (the **Subject Offenses**).

14.      I subsequently obtained arrest warrants for all subjects, which were then input into the National Crime Information Center (NCIC) database. Kent County (MI) Detective Timothy Dykgraaf then contacted the FBI Newark for assistance in locating and

apprehending both RAMIREZ-Perez and CHAPARRO-Perez, who were believed to be residing in the Northern New Jersey area.

15.     Based on information provided by West-Michigan investigators, and information gathered by the FBI, investigators conducted surveillance at a residence in the Trenton, New Jersey area in early July 2025. The FBI believed that they saw both RAMIREZ-Perez and CHAPARRO-Perez exit the same residence and enter a car, which then departed the area.

16.     The FBI conducted surveillance at the Trenton, New Jersey residence until September 3, 2025. Surveillance units saw both subjects again depart the residence and then drive towards Elizabeth, New Jersey. The FBI followed the vehicle until they conducted a traffic stop near 625 Evans Street in Elizabeth, New Jersey at 9:15 am.

17.     RAMIREZ-Perez and CHAPARRO-Perez were both positively identified and taken into custody. Each subject was in possession of two (2) cellular telephones: a Motorola Model XT2413V and Apple I-Phone (the **Subject Cellphones**). Each subject was also in possession of multiple forms of identification, with some appearing to be legitimate while others appeared to be counterfeit.

18.     The FBI Newark separated each subject's personal belongings into evidence bags, which contained their identification documents, cash, keys, personal belongings, and the **Subject Cellphones**. The **Subject Cellphones** were secured and placed in airplane mode to prevent any changes, additions, or deletions from the **Subject Cellphones**. The **Subject Cellphones** have been maintained with sufficient battery power to keep the devices on. The evidence bags were then overnighted to the HSI Grand Rapids office pending further forensic reviews.

a. Ivan CHAPARRO-Perez' cellular telephones:

i.    Motorola XT2413V (IMEI: 355179435559995);



ii. Red Apple I-Phone;



b. Iesua RAMIREZ-Perez' cellular telephones:

i.    Motorola XT2413V (IMEI:355179433349589);

7



ii. Red Apple I-Phone;



**SPECIFICS OF SEIZING AND SEARCHING ELECTRONIC DEVICES**

19.         Based upon my training and experience in the forensic examination of computers, smartphones, and related peripherals, and my conversations with forensic examiners, I know:

    a. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  It may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

    b. Computer files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed.  Even when such files have been deleted, they can be recovered months or years later using readily available forensic tools.

    c. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with

computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

d. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

e. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

f. Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little to no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a

9

set block of storage space – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

20.     In light of these concerns, I request the Court's permission to search, copy, and image the listed devices that are believed to contain evidence described in the warrant, and to conduct a forensic examination for the evidence, fruits, and instrumentalities of violations of the **Subject Offenses**.

## REQUEST FOR AUTHORIZATION TO UNLOCK DEVICES

21.     Based on my knowledge and experience, and information provided to me by others, I know that certain electronic devices may be locked and/or unlocked by personal identification numbers ("PIN"), gestures or motions, and/or with biometric features, such as thumb and fingerprint recognition (collectively, "fingerprint ID") and/or facial recognition ("facial ID").

22.     If a user enables the fingerprint ID unlock feature on a device, he or she can register several fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's sensor, which typically is found on the front of the device. In my training and experience, users of devices that offer fingerprint ID or facial ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's

contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

23.     In some circumstances, a fingerprint or face cannot be used to unlock a device, and a passcode or password must be used instead. Depending on the configuration of the security settings on the phone, the opportunity to unlock the device via fingerprint ID or facial ID exists only for a short time. Fingerprint ID and facial ID also may not unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) several unsuccessful attempts to unlock the device are made.

24.     The passcode or password that would unlock the device(s) is not known to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user(s) or present the face of the user(s) of the device(s) found during the search to the device's fingerprint ID or facial ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant device(s) via fingerprint ID or facial ID is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

25.     Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the device(s), this will result in the device requiring the entry of a password or passcode before it can be unlocked.

26.     CHAPARRO-Perez and RAMIREZ-Perez are currently incarcerated in the Newaygo County Jail in White Cloud, Michigan after being extradited to the Western

District of Michigan.  Therefore, they will both be available to provide biometric information if authorized by the court.

27.      Based on the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of CHAPARRO-Perez and RAMIREZ-Perez to the fingerprint ID sensor or to present their faces to the facial ID sensor of any seized device(s) to attempt to unlock any devices seized under this warrant in order to search their contents as authorized by this warrant.

## **CONCLUSION**

28.      Based on the above information, there probable cause to believe that evidence, contraband, and fruits of, and other items related to the conspiracy to transport stolen property, in violation of 18 U.S.C. §§ 2314 and 371, are present on the item described in Attachment A.  Accordingly, I respectfully request that this Court issue a search warrant for the listed item, more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B, which constitute evidence, contraband, fruits, and other items related the conspiracy to transport stolen property, in violation of 18 U.S.C. §§ 2314 and 371.